1   PSYCH-APPEAL, INC.
    Meiram Bendat (Cal. Bar No. 198884)
2   7 West Figueroa Street, Suite 300
    PMB # 300059
3   Santa Barbara, CA 93101
    Tel: (310) 598-3690
4   mbendat@psych-appeal.com

5
    ZUCKERMAN SPAEDER LLP
6   Caroline E. Reynolds (*pro hac vice*)
    1800 M St., NW, Suite 1000
7   Washington, DC 20036
    Tel: (202) 778-1800
8   Fax: (202) 822-8106
    creynolds@zuckerman.com
9

10  *Attorneys for Plaintiffs*; *additional counsel listed on signature page*

11

12                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
13                    SAN FRANCISCO DIVISION

14  | BARBARA BEACH, on her own behalf and on | Case No. 3:21-cv-08612-RS |
    behalf of her beneficiary daughter and all others
15  similarly situated, JOHN DOE, on his own
    behalf and on behalf of all others similarly
16  situated, JOHN LOE, on his own behalf and on   **AMENDED CLASS ACTION**
    behalf of his beneficiary son and all others    **COMPLAINT**
17  similarly situated, JOHN POE, by and through
    his agent, Jane Poe, on his own behalf and on
18  behalf of all others similarly situated, JOHN
    ROE, by and through his agent Mark Roe, on his
19  own behalf and on behalf of all others similarly
    situated, and JOHN ZOE, by and through his
20  agent, Mark Zoe, on his own behalf and on
    behalf of all others similarly situated,
21
22                  Plaintiffs,

23          v.

24  UNITED BEHAVIORAL HEALTH,

25                  Defendant.

26

27

28

BARBARA BEACH, on her own behalf and on behalf of her beneficiary daughter and all others similarly situated; JOHN DOE,[1] on his own behalf and on behalf of all others similarly situated; JOHN LOE, on his own behalf and on behalf of his beneficiary son and all others similarly situated; JOHN POE, by and through his agent Jane Poe, on his own behalf and on behalf of all others similarly situated; JOHN ROE, by and through his agent Mark Roe, on his own behalf and on behalf of all others similarly situated; and JOHN ZOE, by and through his agent, Mark Zoe, on his own behalf and on behalf of all others similarly situated (collectively, "Plaintiffs") complain as follows, based on the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, against Defendant United Behavioral Health ("UBH"):

## INTRODUCTION

1.      Defendant UBH is the administrator of mental health and substance use disorder benefits provided by thousands of employer-sponsored health plans that are subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 - 1461 ("ERISA"). In that capacity, UBH determines whether to approve plan beneficiaries' requests for coverage, which requires UBH to interpret the written terms of the beneficiaries' plans. To standardize its administration of so many plans, UBH develops and uses various written policies that it applies when administering all ERISA plans.

2.      This case arises from UBH's deliberate development of policies designed to reduce the number and value of claims UBH would approve, thereby serving the financial interests of UBH, its affiliates, and the employer plan sponsors they consider their customers. The UBH policies at issue in this case all disregard or directly flout the terms of the Plaintiffs' Plans. UBH developed them to serve its own interests, rather than those of the plan members. As a result, UBH's development and adoption of its self-serving policies breach the fiduciary duties UBH owes to all ERISA plan members, including Plaintiffs.

---

[1]     The Court previously granted Plaintiffs' Motion to Proceed Anonymously in this action, permitting certain Plaintiffs to use the fictitious names "John Doe"; "John Loe"; "John and Jane Poe"; "John and Mark Roe"; and "John and Mark Zoe." *See* ECF No. 18.

3.      In addition to challenging UBH's breaches of its fiduciary duties, Plaintiffs challenge UBH's improper denials of their requests for benefits pursuant to the 2018 and 2019 editions of UBH's "Level of Care Guidelines," which were the decision criteria UBH used to determine whether mental health and/or substance use disorder services for which coverage was requested were consistent with generally accepted standards of care ("GASC"). While the Plaintiffs' Plans required, as one essential prerequisite for coverage, that services must be consistent with GASC (i.e. the "GASC Requirement"), UBH developed Guidelines for implementing that requirement that were pervasively more restrictive than the applicable generally accepted standards.

4.      Plaintiffs also, separately, challenge UBH's denials of their requests for coverage of residential treatment services in their entirety, even though UBH found that some of the services provided at that level of care—which are specifically and separately listed as covered services under Plaintiffs' plans—were medically necessary for Plaintiffs. Pursuant to UBH's "Facility-Based Behavioral Health Program Reimbursement Policy," UBH insists that facilities submit claims for reimbursement for facility-based care using a "daily rate," which is a bundled per-diem charge that purportedly accounts for all services provided for treatment at a given level of care. When UBH denies such claims for lack of medical necessity, UBH denies **all** coverage, even when UBH acknowledges that some of the services bundled into the per diem charge are medically necessary for the member, rather than considering those services on an un-bundled basis and approving coverage for them. And when claims for covered services are submitted on an un-bundled basis outside of the "daily rate" identified in UBH's "Facility-Based Behavioral Health Program Reimbursement Policy," UBH denies those claims, too.

**THE PARTIES**

5.      Plaintiff Barbara Beach is a participant in a self-funded employee welfare benefit plan sponsored by her employer and administered by United Healthcare Services, Inc. (the "Beach Plan"). Plaintiff Beach's daughter is Plaintiff's dependent and a beneficiary of the Beach Plan. Plaintiff Beach and her daughter are permanent residents of Saratoga, California.

6.      At all times relevant to this Complaint, Plaintiff John Doe was a participant in a self-funded employee welfare benefit plan sponsored by his former employer and administered by United Healthcare Services, Inc. (the "Doe Plan"). Plaintiff Doe is a permanent resident of Fairfax County, Virginia.

7.      At all times relevant to this Complaint, Plaintiff John Loe was a participant in a self-funded employee welfare benefit plan sponsored by his employer and administered by United Healthcare Services, Inc. (the "Loe Plan"). Plaintiff Loe's son is Plaintiff's dependent and at all times relevant to this Complaint was a beneficiary of the Loe Plan. Plaintiff Loe and his son are permanent residents of Northbrook, Illinois.

8.      At all times relevant to this Complaint, Plaintiff John Poe was a participant in a fully-insured employee welfare benefit plan issued and administered by UnitedHealthcare Insurance Company (the "Poe Plan"). John Poe's mother, Jane Poe, is representing his interests in this litigation pursuant to a duly executed power of attorney. John Poe is a permanent resident of La Jolla, California, and Jane Poe is a permanent resident of Atlanta, Georgia.

9.      At all times relevant to this Complaint, Plaintiff John Roe was a participant in a self-funded employee welfare benefit plan sponsored by his former employer and administered by United Healthcare Services, Inc. (the "Roe Plan"). John Roe's father, Mark Roe, is representing his interests in this litigation pursuant to a duly executed power of attorney. Mark and John Roe are permanent residents of Middletown, Ohio.

10.     At all times relevant to this Complaint, Plaintiff John Zoe was a member of a self-funded employee welfare benefit plan sponsored by his father's employer and administered by United Healthcare Services, Inc. (the "Zoe Plan"). John Zoe's father, Mark Zoe, represents his interests in this litigation pursuant to a duly executed power of attorney. John Zoe is a permanent resident of Nashville, Tennessee. Mark Zoe is a permanent resident of New York, New York.

11.     Defendant United Behavioral Health ("UBH"), which also operates as OptumHealth Behavioral Solutions, is a corporation organized under California law, with its principal place of business in San Francisco, California.

12.     UBH is a third-tier wholly-owned subsidiary of United HealthCare Services, Inc., which is wholly owned by UnitedHealth Group Incorporated. UnitedHealth Group Inc. also wholly owns UnitedHealthcare Insurance Company.

13.     UBH administers mental health and substance use disorder benefits for commercial welfare benefit plans pursuant to administrative services agreements through which UBH's affiliates, including United Healthcare Services, Inc. and UnitedHealthcare Insurance Company, delegate fiduciary responsibilities to UBH. In this role, UBH administers requests for coverage on behalf of members of health benefit plans governed by ERISA, including the Plaintiffs' health benefit plans (hereafter, the "Plaintiffs' Plans" or the "Plans"). UBH thus has the authority to make final and binding benefit coverage determinations for mental health and substance use disorder services (collectively, "behavioral health services") under the plans it administers.

14.     Because of the role UBH plays in making benefit determinations under the plans it administers, UBH is a fiduciary under ERISA.

## JURISDICTION AND VENUE

15.     Defendant UBH's actions in administering employer-sponsored health care plans, including exercising discretion with respect to determinations of coverage for Plaintiffs under their Plans, are governed by ERISA, 29 U.S.C. §§ 1001 - 1461. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

16.     Personal jurisdiction over Defendant UBH exists with this Court. United Behavioral Health is a corporation organized under California law, with significant contacts in California.

17.     Venue is appropriate in this District. Defendant is headquartered in this District, administers plans here and conducts significant operations here. 29 U.S.C. §1132(e)(2).

## INTRADISTRICT ASSIGNMENT

18.     This case should be assigned to the San Francisco Division of this Court because Defendant UBH is headquartered in this District, administers plans here and conducts significant

operations here. In addition, assignment to the San Francisco Division is appropriate because this action is related to a putative class action currently pending before Judge Seeborg, *Jones, et al. v. United Behavioral Health*, Case No. 3:19-cv-06999-RS (N.D. Cal.), and two certified class actions currently pending before Magistrate Judge Spero, by consent: *Wit, et al. v. United Behavioral Health*, Case No. 14-cv-02346-JCS (N.D. Cal.) and *Alexander, et al. v. United Behavioral Health*, Case No. 14-cv-05337-JCS (N.D. Cal.) (referred to collectively herein as the "*Wit* Litigation.").

## FACTUAL ALLEGATIONS

### I.     UBH's Status as an ERISA Fiduciary

19.     The Plaintiffs' Plans all identify UBH's affiliate, UnitedHealthcare Insurance Company, or UBH's parent, United Healthcare Services Inc. "and its affiliates," as the Plans' Claims Administrator. The Plans explicitly delegate to the named Claims Administrator the discretion to interpret the Plan terms, conditions, limitations, and exclusions. Each Plan further authorizes the Claims Administrator to delegate this discretionary authority to other entities that provide services for the administration of the Plan.

20.     Pursuant to that authority, the Claims Administrator for each of the Plaintiffs' Plans has delegated to UBH the responsibility for administering behavioral health benefits, including interpreting the written Plan terms, conditions, limitations, and exclusions with respect to mental health and substance use disorder benefits. As the behavioral health administrator for the Plans, UBH exercises this discretion to make coverage determinations for behavioral health services, and to cause any resulting benefit payments to be made by the Plans.

21.     UBH's standard practice when making coverage determinations is first, to confirm that the coverage request satisfies the "administrative" prerequisites for coverage, such as member eligibility and application of any non-clinical exclusions or limitations. If the administrative prerequisites are satisfied, UBH then assesses whether there are any clinical grounds for denial, including lack of medical necessity or clinical appropriateness of the services requested.

22. When UBH denies a request for coverage under a plan it administers, the legal consequence is that the plan will not pay any benefits for the services for which coverage was requested. As a result, upon receiving the denial, the plan participant has only three choices: to pay for treatment out-of-pocket; to seek different treatment for which coverage may be approved; or to forego treatment altogether.

23. Because UBH has and exercises discretion with respect to the administration of the Plans, and because it makes all benefit determinations for behavioral health coverage under the Plans, UBH is a fiduciary within the meaning of ERISA, 29 U.S.C. § 1104.

24. As an ERISA fiduciary, UBH owes a duty of loyalty to plan participants and beneficiaries, which requires it to discharge its duties "solely in the interests of the participants and beneficiaries" of the plans it administers and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plan. UBH also owes plan participants and beneficiaries a duty of care, which requires it to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans, so long as such terms are consistent with ERISA.

25. As a claims fiduciary for the plans it administers, ERISA also required UBH to "provide adequate notice in writing" of "the specific reasons" for any benefit denial, "written in a manner calculated to be understood" by the plan participant, and to provide the participant a "reasonable opportunity" for "a full and fair review" of the denial. 29 U.S.C. § 1133. As further set forth in ERISA's implementing regulations, a fiduciary's claims procedures are not reasonable unless among other requirements, the fiduciary's written notification of denial refers to the "specific plan provisions on which the determination is based," describes "any additional material or information necessary for the claimant to perfect the claim," and identifies any "internal rule, guideline, protocol or other similar criterion" on which the denial was based. *See* 29 C.F.R. § 2560.503-1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**II.     Relevant Terms of the Plaintiffs' Plans**

26.     The Beach Plan, the Doe Plan, the Loe Plan, the Poe Plan, the Roe Plan, and the Zoe Plan (collectively the "Plaintiffs' Plans" or the "Plans") are all governed by ERISA.

   **a.   Covered Services**

27.     The Plans cover treatment for sickness, injury, mental illness, and substance use disorders. Residential treatment is a covered benefit under each of the Plans. The Plans do not limit coverage for residential treatment to emergency, short-term, or crisis stabilization services.

28.     The Plans also include coverage for behavioral health services at the Partial Hospitalization ("PHP") and Intensive Outpatient ("IOP") levels of care.

29.     The Plans further specify that covered services for mental health conditions and substance use disorders include the following services (the "Enumerated Services"):

- Diagnostic evaluations, assessment and treatment planning;

- Treatment and/or procedures;

- Medication management and other associated treatments;

- Individual, family, and group therapy;

- Provider-based case management services; and

- Crisis intervention.

30.     The Plans do not exclude coverage for PHP, IOP or the Enumerated Services based solely on the fact that they were provided in a residential treatment setting.

31.     The Plans also do not exclude coverage for PHP, IOP, or the Enumerated Services, when they are medically necessary, based solely on the fact that the member also received *additional* behavioral health services that UBH does not believe are medically necessary.

   **b.   Generally Accepted Standards Requirement**

32.     One essential requirement for coverage under all of the Plaintiffs' Plans is that services must be consistent with generally accepted standards of care, or "GASC" (hereafter, the "GASC Requirement").

33.    The Plans use slightly different wording for the GASC Requirement, but the differences are immaterial. UBH interprets the GASC Requirement of all of the Plaintiffs' Plans, described below, as having the same meaning.

34.    Under the terms of the Beach, Loe, Poe, and Roe Plans, "Covered Services" are defined as, among other requirements, those that are "Medically Necessary." The Plans further define Medically Necessary services as those that are, among other things, "[i]n accordance with Generally Accepted Standards of Medical Practice."

35.    According to the Beach, Loe, Poe, and Roe Plans, "*Generally Accepted Standards of Medical Practice* are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes." If no such evidence is available, the Beach, Loe, Poe, and Roe Plans provide that "standards that are based on Physician specialty society recommendations or professional standards of care may be considered."

36.    Under the terms of the Doe and Zoe Plans, "Covered Health Services" are defined as those the Claims Administrator determines to be, among other things, "consistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines as described below." The Plans further define "scientific evidence" as "the results of controlled Clinical Trials or other studies published in peer-reviewed, medical literature generally recognized by the relevant medical specialty community; and "prevailing medical standards and clinical guidelines" as "nationally recognized professional standards of care including, but not limited to, national consensus statements, nationally recognized clinical guidelines, and national specialty society guidelines."

37.    Therefore, under the terms of all the Plaintiffs' Plans, one of the essential determinations UBH must make when reviewing claims for coverage under the Plans is whether the services for which coverage is requested are consistent with generally accepted standards of care.

### III.    Generally Accepted Standards of Care

38.    Generally accepted standards of care, in the context of mental health and substance use disorder services, are the standards that have achieved widespread acceptance among behavioral health professionals.

39.    In the area of mental health and substance use disorder treatment, there is a continuum of intensity at which services are delivered. There are generally accepted standards of care for matching patients with the level of care that is most appropriate and effective for treating patients' conditions.

40.    These generally accepted standards of care can be gleaned from and are reflected in multiple sources, including peer-reviewed studies in academic journals, consensus guidelines from professional organizations, and guidelines and materials distributed by government agencies, including: (a) the American Society of Addiction Medicine ("ASAM") Criteria; (b) the American Association of Community Psychiatrists' ("AACP") Level of Care Utilization System; (c) the Child and Adolescent Level of Care Utilization System ("CALOCUS") developed by AACP and the American Academy of Child and Adolescent Psychiatry ("AACAP"); and the Child and Adolescent Service Intensity Instrument ("CASII") which was developed by AACAP in 2001 as a refinement of CALOCUS; (d) the Medicare benefit policy manual issued by the Centers for Medicare and Medicaid Services ("CMS"); (e) the APA Practice Guidelines for the Treatment of Patients with Substance Use Disorders, Second Edition; (f) the American Psychiatric Association's Practice Guidelines for the Treatment of Patients with Major Depressive Disorder; and (g) AACAP's Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers.

41.    The generally accepted standards of care for matching patients with the most appropriate and effective level of care for treating patients' mental health conditions and substance use disorders include the following:

a.    **First**, many mental health and substance use disorders are long-term and chronic. While current symptoms are typically related to a patient's chronic condition, it is

generally accepted in the behavioral health community that effective treatment of individuals with mental health or substance use disorders is not limited to the alleviation of the current symptoms. Rather, effective treatment requires treatment of the chronic underlying condition as well.

b. **Second**, many individuals with behavioral health diagnoses have multiple, co-occurring disorders. Because co-occurring disorders can aggravate each other, treating any of them effectively requires a comprehensive, coordinated approach to all conditions. Similarly, the presence of a co-occurring medical condition is an aggravating factor that may necessitate a more intensive level of care for the patient to be effectively treated.

c. **Third**, in order to treat patients with mental health or substance use disorders effectively, it is important to "match" them to the appropriate level of care. The driving factors in determining the appropriate treatment level should be safety and effectiveness. Placement in a less restrictive environment is appropriate only if it is likely to be safe and *just as effective* as treatment at a higher level of care.

d. **Fourth**, when there is ambiguity as to the appropriate level of care, generally accepted standards call for erring on the side of caution by placing the patient in a higher level of care. Research has demonstrated that patients with mental health and substance use disorders who receive treatment at a lower level of care than is clinically appropriate face worse outcomes than those who are treated at the appropriate level of care. On the other hand, there is no research that establishes that placement at a higher level of care than is appropriate results in an increase in adverse outcomes.

e. **Fifth**, while effective treatment may result in improvement in the patient's level of functioning, it is well-established that effective treatment also includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning.

f.  **Sixth**, the appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment. Similarly, it is inconsistent with generally accepted standards of medical practice to require discharge as soon as a patient becomes unwilling or unable to participate in treatment.

g.  **Seventh**, one of the primary differences between adults, on the one hand, and children and adolescents, on the other, is that children and adolescents are not fully "developed," in the psychiatric sense. The unique needs of children and adolescents must be taken into account when making level of care decisions involving their treatment for mental health or substance use disorders. One of the ways practitioners take into account the developmental level of a child or adolescent in making treatment decisions is by relaxing the threshold requirements for admission and continued service at a given level of care.

h.  **Eighth**, the determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient. Except in acute situations that require hospitalization, where safety alone may necessitate the highest level of care, decisions about the level of care at which a patient should receive treatment should be made based upon a holistic, biopsychosocial assessment that involves consideration of multiple dimensions.

42.  UBH, as a claims administrator and ERISA fiduciary, owed the participants and beneficiaries of the Plans it administers a fiduciary duty to take reasonable steps to interpret the Plans, including when establishing the criteria by which it would determine whether services are consistent with GASC. It was UBH's duty to use due care and act prudently and solely in the interests of the plan participants and beneficiaries when doing so.

43.     When interpreting its plans, UBH had access to the independent, publicly available sources, described above, that elucidate the generally accepted standards of care. Thus, UBH knew, or should have known, what the generally accepted standards of care were.

IV.    **UBH's 2018 and 2019 Level of Care Guidelines Were More Restrictive than Generally Accepted Standards of Care**

44.     Until recently, UBH exercised its discretion under the plans it administers by, among other things, developing, adopting, and applying its own clinical criteria to implement the plans' GASC Requirement. At the time the Plaintiffs' coverage requests were denied, the clinical criteria UBH had adopted as its standardized interpretation of the plans' GASC Requirement, and which UBH applied in making clinical coverage determinations, were called the UBH Level of Care Guidelines.

45.     UBH developed its Level of Care Guidelines to implement the GASC Requirement with respect to all the commercial plans it administers.

46.     The Level of Care Guidelines were organized by the situs of care, or "level of care," according to progressive levels of service intensity along the continuum of care (*i.e.*, outpatient, intensive outpatient, partial hospitalization, residential, and hospital treatment).

47.     The 2011 through 2017 editions of UBH's Level of Care Guidelines—which are substantially similar to the 2018 and 2019 editions of the Level of Care Guidelines at issue in this case—were among the UBH Guidelines challenged in the *Wit* Litigation. The certified classes in the *Wit* Litigation (collectively, the "*Wit* Class") include only plan members whose requests for coverage were denied by UBH between May 22, 2011 and June 1, 2017.

48.     The *Jones* case was later filed on behalf of UBH plan members whose requests coverage were denied by UBH between June 2, 2017 and February 7, 2018, based on the 2017 Level of Care Guidelines challenged in the *Wit* Litigation. *Jones*, which has also been certified as a class action, is also ongoing as of the date this Amended Complaint is being filed.

49.     Following a trial on the merits of the *Wit* Litigation, Magistrate Judge Joseph C. Spero of this Court found that the 2011 through 2017 editions of the UBH Level of Care

Guidelines were much more restrictive than generally accepted standards of care, and thus conflicted with and were not reasonable interpretations of the GASC Requirements in the *Wit* Class members' plans. Judge Spero further found that UBH developed the Guidelines to serve its own financial interests, rather than the interests of the plan participants and beneficiaries. Accordingly, Judge Spero concluded that UBH breached its ERISA fiduciary duties by developing and adopting its excessively restrictive, self-serving Guidelines and that UBH abused its discretion when it used the Guidelines to deny coverage to the *Wit* Class members.

50.    In a detailed opinion, Judge Spero found that UBH used its Level of Care Guidelines to implement the GASC Requirement in the Plans UBH administered. Yet, as Judge Spero further found, the UBH Level of Care Guidelines in effect from 2011 to 2017 were pervasively more restrictive than generally accepted standards of care because they restricted coverage to the treatment of acute behavioral health conditions and symptoms, in contrast to generally accepted standards of care that include concurrent effective treatment to address chronic or co-occurring conditions or symptoms.

51.    Judge Spero found that UBH's 2011-2017 Level of Care Guidelines were "riddled with requirements that provided for narrower coverage than is consistent with generally accepted standards of care." Judge Spero further found that these defects were deliberate and driven by UBH's financial self-interest, in breach of UBH's duty of loyalty to the *Wit* Class members, and that UBH's use of the Level of Care Guidelines to determine whether services were consistent with GASC was "unreasonable and an abuse of discretion because [the Guidelines] were more restrictive than generally accepted standards of care."

52.    UBH appealed the judgment in the *Wit* Litigation. In March 2023, the Ninth Circuit affirmed the judgment in part, reversed it in part, and remanded the case to this Court. On appeal, UBH did not challenge any of Judge Spero's factual findings as clearly erroneous, and the Ninth Circuit did not hold that any of the factual findings were clearly erroneous. As of the date of this Amended Complaint, the proceedings on remand in the *Wit* Litigation are ongoing.

53.    In short, UBH has already been found liable for breaching its fiduciary duties and violating ERISA by creating its self-servingly restrictive Level of Care Guidelines and using them

to deny coverage to thousands of its members. UBH's 2018 and 2019 Level of Care Guidelines, which are only *slightly* revised versions of the Guidelines invalidated in the *Wit* Litigation and result from the same self-interested development process, suffer from the same fatal defects as the 2011 through 2017 editions.

54.    Just as in prior years, the 2018 and 2019 Level of Care Guidelines at issue in this case contained a set of mandatory—but excessively restrictive—"Common Criteria," all of which had to be satisfied for coverage to be approved at any level of care. In other words, it was impossible for coverage to be approved under the Guidelines unless the overly-narrow Common Criteria were satisfied.

55.    In addition, the 2018 and 2019 Level of Care Guidelines, as in prior years, contained specific criteria applicable to particular levels of care in the context of either mental health conditions or substance use disorders, which *also* had to be satisfied in order for coverage to be approved at a particular level of care, and which *also* contained requirements designed to narrow the scope of coverage otherwise available under the plans UBH administered.

56.    Moreover, UBH adopted the 2018 and 2019 editions of the Level of Care Guidelines—with minimal, non-substantive changes from the 2017 edition—*after* the October 2017 trial in the *Wit* Litigation, and continued to use them to implement the plans' GASC Requirement even though UBH's own retained expert testified in that trial that no practitioner "worth his salt" would use UBH's Level of Care Guidelines to determine what the generally accepted standards of care are, but rather would go straight to the professional society guidelines that set forth accepted standards of care, such as the ASAM or LOCUS criteria.

57.    In late 2018, UBH announced that it would "retire" its proprietary substance use disorder guidelines (including portions of the Level of Care Guidelines addressing substance use disorder treatment) and instead begin applying the ASAM Criteria when administering benefits for substance use disorder treatment.

58.    Only after Judge Spero issued his ruling on the merits in the *Wit* Litigation in March 2019, UBH announced that it also intended to discontinue use of its Level of Care

1  Guidelines for mental health treatment and to transition to non-profit, clinical specialty
2  association guidelines by early 2020.

3  59.  Notwithstanding these subsequent developments, and even though UBH knew, or
4  should have known, that its 2018 and 2019 Level of Care Guidelines were much more restrictive
5  than generally accepted standards of care, and that UBH developed them to advance its own
6  financial self-interest as well as that of its other corporate affiliates and employer plan sponsors,
7  UBH continued to apply its unreasonably overly-restrictive Level of Care Guidelines from May
8  9, 2018 until February 12, 2019 (2018 LOCGs) and from February 12, 2019 through January 30,
9  2020 (2019 LOCGs).

10  60.  By continuing to use its own overly-restrictive Guidelines, UBH, among other
11  things, (a) avoided or reduced the benefit expense it would otherwise pay from its own assets if
12  approving coverage under insured plans; and (b) saved money for its self-funded plan-sponsor
13  customers (albeit in contravention of plan terms), making it more likely that those plan sponsors
14  would continue to employ UBH as claims administrator; thus prioritizing UBH's own financial
15  interests over the interests of plan participants and beneficiaries.

16  **V.    UBH's Uniform Clinical Peer Review Practices**

17  61.  Pursuant to UBH's standard utilization review procedures, before implementing a
18  plan's GASC Requirement (that is, before determining whether the services for which coverage is
19  requested are consistent with GASC), one of UBH's thousands of front-line reviewers (known as
20  "Care Advocates") first verifies the patient's enrollment and eligibility for benefits and whether
21  there are any administrative exclusions or limitations that would bar coverage of the requested
22  service, regardless of clinical circumstances.

23  62.  Only if there are no such administrative exclusions or limitations—that is, if the
24  service is otherwise covered under the relevant plan, subject only to clinical review—the Care
25  Advocate then applies UBH's standard medical necessity criteria to evaluate whether the
26  requested services meet the plan's GASC Requirement. At the time the Plaintiffs' requests were
27  denied, UBH's standard medical necessity criteria were its Level of Care Guidelines.

28

63.     UBH's Care Advocates have no authority to deny requests for coverage on clinical grounds. Therefore, if a Care Advocate believes that a coverage request does not meet UBH's medical necessity criteria, he or she must escalate the review to a so-called "Peer Reviewer." Only a Peer Reviewer can issue a medical necessity denial.

64.     UBH has fewer than 100 Peer Reviewers to conduct all of its Peer-level clinical reviews. For that reason, in practice, UBH does not complete Peer Reviews of coverage requests that can be denied on administrative grounds. Instead, if there is an administrative ground for denying coverage, the Care Advocate completes an administrative denial.

65.     Thus, if UBH clinically denied a request for coverage based on its Level of Care Guidelines, the Guidelines' criteria were necessarily the exclusive and decisive ground for denial.

## VI.     UBH's Standard Policy of Bundling Facility-Based Behavioral Health Services

66.     Under UBH's "Facility-Based Behavioral Health Program Reimbursement Policy," in effect from at least March 15, 2016 through the present, when UBH approves coverage for "facility-based" behavioral health services—meaning services at the inpatient, residential treatment, partial hospitalization, and intensive outpatient levels of care—UBH reimburses the cost of all services provided during a day of treatment "using a single day rate for all expected components of an active treatment program." Pursuant to UBH's policy, the "single day rate" includes "payment for all dependent, ancillary, supportive, and therapeutic services into payment for the primary independent program service." As such, UBH does not separately reimburse for such services "when billed with the primary independent program service" for which coverage was approved.

67.     UBH's standard policy also requires providers submitting requests for coverage (that is, even before the services are approved) to "bundle" all of the separate services provided within the scope of a given facility-based level of care into a single request for reimbursement, rather than submitting a separate claim for coverage of each service. The policy states that UBH considers the following services to be "an integral part of the program services that will be reimbursed under the single day rate":

- All supplies

- Ancillary services

- Diagnostic evaluation and assessment including psychological and neuropsychological testing

- Clinical diagnostic laboratory tests including drug testing

- Treatment planning

- Procedures described by add-on codes

- Individual therapy

- Group therapy

- Family therapy

- Crisis intervention

68.     Thus, pursuant to its standard reimbursement policy, UBH will not accept requests for coverage of the discrete "integral" component parts of facility-based treatment. Instead, UBH requires claims for coverage of those services to be submitted as a bundle, which, if coverage is approved, UBH will pay at a "single day" rate. If claims are not submitted in accord with UBH's "Facility-Based Behavioral Health Program Reimbursement Policy," they will be denied.

69.     If UBH determines that the requested facility-based treatment is not covered at the requested level of care, however, UBH also relies on this internal policy to deny the request for coverage in its entirety. In other words, UBH relies on its reimbursement policy to *deny* claims for facility-based services on a "single day," bundled basis, rather than determining whether to approve coverage for any of the lesser-included component services necessarily provided as part of the facility-based program. UBH does so even if the component services are otherwise covered under the member's Plan and even where, as here, UBH has already determined that services necessarily included within the facility-based level of care are medically necessary for the member.

70.     Healthcare providers use Current Procedural Terminology ("CPT") or Healthcare Common Procedure Coding System ("HCPCS") codes to identify services when submitting

claims for coverage. While both systems include "per diem" codes for residential, partial hospitalization, and intensive outpatient services, they also include distinct codes that correspond to each of the component services listed above, which UBH admits are integral to facility-based care.

71.    Thus, UBH knows those component services are provided as part of facility-based care, and UBH could develop and apply a reimbursement policy that calls for the payment of benefits for the discrete component services that were medically necessary, but instead, it has adopted a standard policy of evaluating coverage for all facility-based care *only* on a bundled, "single day" unit basis. As a result, when UBH denies coverage for a day of facility-based treatment, it is denying coverage for all of the services *it required* to be bundled together—and it categorically refuses to un-bundle them, even if it admits that some of the otherwise-covered component services are medically necessary.

72.    On an un-bundled basis, residential treatment subsumes the clinical services provided by both partial hospitalization programs ("PHP") and intensive outpatient treatment ("IOP"). That is, all of the component services that are provided at the less-intensive levels of facility-based care (PHP and IOP) are necessarily also provided at the residential treatment level of care. For the same reason, residential treatment also necessarily subsumes outpatient treatment services, like individual or family therapy.

73.    UBH, however, applies a consistent policy and practice of denying all coverage for *all* services received at a residential treatment center when it deems that level of care unnecessary or inappropriate, even when it admits that services at a fully-subsumed, lower level of care *are* necessary and appropriate.

74.    UBH applied this standard policy and practice to deny coverage to each of the Plaintiffs for services that should have been covered under the Plaintiffs' plans.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VII.    UBH Denied Coverage to Plaintiffs Pursuant to its Overly Restrictive 2018 and 2019 Level of Care Guidelines and its Improper Bundling Policy**

### a.    Plaintiff Beach

75.    Plaintiff Beach's daughter has been diagnosed with co-occurring Major Depressive Disorder, Generalized Anxiety Disorder, and Post-Traumatic Stress Disorder, and had a history of self-harming behaviors and suicidal thoughts, including two suicide attempts. In early November 2019, after her parents found a suicide note in her bedroom, her therapist recommended residential treatment.

76.    On November 7, 2019, Ms. Beach's daughter was admitted to Newport Academy ("Newport") for residential treatment of her mental health conditions. UBH authorized coverage for twelve days, but then denied coverage from November 19, 2019, onward.

77.    In its November 23, 2019 written notification of the adverse benefit determination, UBH stated that the denial was "[b]ased on" its "Medical Necessity criteria for Mental Health Residential Treatment Center Level of Care." The letter further explained why Ms. Beach's daughter did not meet the UBH criteria:

> You[r] child. . . is doing better. She is willing and able to participate in treatment. Her mood is better. She has no thoughts of harming self or others. She is able to take care of daily needs. She is medically stable. She has supportive family.

78.    The only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

79.    The letter also concluded that "Care could continue at Partial Hospitalization Program." Residential treatment subsumes the clinical services provided in PHP (as well as at the IOP and outpatient levels of care).. Thus, services at a partial hospitalization level of care are necessarily included within residential treatment services.

80.    Newport Academy requested an urgent appeal on November 20, 2019. UBH reviewed the urgent appeal and upheld the denial on November 22, 2019, again applying UBH's "MENTAL HEALTH Residential LEVEL OF CARE" guideline and concluding that "the requested service does not meet the level of care guideline." As recorded in UBH's case notes,

the rationale for that determination was that "the patient is not at immediate risk of hurting herself or others. She is medically stable. She is not on psychotropic medication. She does not require 24 hour medical or psychiatric care." UBH's November 22, 2019 case note also states, "Alternative Service Authorized: Mental Health PHP."

81.    On November 25, 2019, Newport Academy submitted another appeal on behalf of Ms. Beach's daughter, attaching 146 pages of medical records.

82.    UBH again upheld its denial of coverage. In its December 26, 2019 written notification, UBH stated that its decision to uphold the denial was "[b]ased on the Optum Level of Care Guideline for Mental Health Residential and Optum Common Criteria for Clinical Best Practices for All Levels of Care Guidelines," and further explained:

> Your child was doing better. She had made good progress in treatment. She was calm. Her mood was stable. She was not requiring medication to stabilize her mood or behavior. She was managing her activities of daily life without issue. It seems that her care could have continued in a less intensive setting.

83.    The only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

84.    Despite UBH's November 22, 2019 decision that partial hospitalization services were medically necessary for Ms. Beach's daughter, UBH continued to deny all coverage for all the treatment services Ms. Beach's daughter was receiving at Newport Academy, even those that would have been provided in a partial hospitalization program.

85.    In the meantime, Ms. Beach submitted an appeal/grievance to UBH on December 3, 2019, objecting to UBH's denial of coverage for her daughter's treatment. In her letter, among other things, Ms. Beach informed UBH that the PHP level of care was not geographically accessible to her daughter. As Ms. Beach explained, the nearest partial hospitalization program was 25 miles from their home and would have required a commute of approximately 1.5 hours each way.

86.    On January 13, 2020, Ms. Beach also submitted a second-level appeal request.

87.    UBH did not respond to Ms. Beach's December 3, 2019 appeal/grievance letter until February 3, 2020. Once again upholding its prior decisions, UBH again cited to its "Level of Care Guidelines," explaining,

> The criteria were not met because: Your child did not need the care provided in Residential Treatment Center setting. Your child could have been treated in a less intensive Level of Care.

> In your case: Your child was participating in treatment and doing better. Your child had a more stable mood. Your child was less depressed and less anxious. Your child was not feeling like harming herself or others. Your child did not have clinical issues requiring 24-hour monitoring in a residential setting. Your child did not have mental health issues preventing treatment in a less intensive setting.

88.    Again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

89.    UBH's February 3, 2020 letter concluded that Ms. Beach's daughter "could have continued care in a Mental Health Partial Hospitalization Program (PHP) setting, with family and community supports." The letter did not respond to the portion of Ms. Beach's grievance that pointed out that PHP was not geographically accessible to her daughter.

90.    UBH's February 3, 2020 letter also stated, "[t]his is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted."

91.    On February 7, 2020, UBH informed Ms. Beach by phone that her January 13, 2020 second-level appeal had been decided and that UBH had upheld the denial of coverage. Ms. Beach never received a written notification of the reasons for that determination.

92.    By filing all administrative appeals required under the Beach Plan, Plaintiff Beach exhausted her administrative remedies.

93.    Ms. Beach incurred significant, unreimbursed out-of-pocket expenses for her daughter's residential treatment services from November 19, 2019 through December 6, 2019. After UBH denied any further coverage, on December 6, 2019, Ms. Beach was forced to remove her daughter from Newport Academy, against medical advice, because Ms. Beach did not have sufficient funds to continue paying for her daughter's care out of pocket.

94. Even worse, Ms. Beach's daughter did not receive the full course of residential treatment recommended by her treating providers, and she has suffered adverse consequences not only from having her residential treatment prematurely truncated, but also from being treated at a level of care that was not sufficiently intensive to provide effective treatment for her chronic mental health conditions.

95. Before removing her daughter from Newport Academy, Ms. Beach attempted to locate an available partial hospitalization program, but could not find one within reasonable geographic proximity to their home. Because UBH refused to authorize continued residential treatment services or any of the component services being provided as part of that care, and no PHP services were available, Ms. Beach's daughter was admitted to an intensive outpatient program, a less-intensive level of care than PHP (which even UBH believed was medically necessary for Ms. Beach's daughter).

96. Just over a week after her discharge from Newport Academy, Ms. Beach's daughter became suicidal after returning home from intensive outpatient treatment. Ms. Beach sought help on an emergency basis from her daughter's therapist, who spent hours on the phone to see her through the crisis.

97. Having never received a full course of treatment at the intensity recommended by her providers, Ms. Beach's daughter continued to struggle with her mental health conditions. In November 2020, she attempted suicide by overdose, after which she was hospitalized for five days.

98. Despite its own finding that services at a partial hospitalization program level of care were medically necessary, UBH did not approve benefits for the services Ms. Beach's daughter received at Newport Academy at the "daily rate" applicable to that lesser-included level of care. Nor did UBH approve benefits for any of the component services Ms. Beach's daughter received while in residential treatment at Newport Academy. Instead, UBH denied coverage for the services in full, despite its own finding that Ms. Beach's daughter needed ongoing treatment.

99. In addition, despite its finding that PHP services were medically necessary for Ms. Beach's daughter, UBH's denial letters did not state it would authorize coverage for any portion

of the treatment services Ms. Beach's daughter was receiving at Newport Academy, even the component services that were materially identical to those she would have received through a partial hospitalization program. UBH did not inform Ms. Beach that benefits were or would be approved for any lesser-included level of care. UBH's letters also did not describe what additional material or information would be necessary for Ms Beach to perfect a claim for the partial hospitalization services or any other component services her daughter was receiving at Newport Academy. Instead, as dictated by its Facility-Based Behavioral Health Program Reimbursement Policy, UBH denied coverage, in full, for each day of residential treatment and all the component parts of that treatment.

100.    The only reason UBH cited for denying coverage was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines. UBH did not cite any administrative or clinical ground for denying coverage for the component services that were materially identical to those Ms. Beach's daughter would have received through a partial hospitalization program. Nor did UBH disclose that its denial of coverage for all the services was based on its Facility-Based Behavioral Health Program Reimbursement Policy. At the same time, UBH admitted that partial hospitalization services were medically necessary and appropriate for Ms. Beach's daughter. Accordingly, UBH should have approved coverage under Ms. Beach's Plan for the component services her daughter received that were materially identical to those provided in a partial hospitalization program.

### b. Plaintiff Doe

101.    On October 22, 2018, Plaintiff Doe was admitted to the Richard J. Caron Foundation ("Caron") for residential detoxification treatment for his severe alcohol use disorder. UBH approved coverage for three days of detoxification, and allowed Mr. Doe to step down to residential rehabilitation, for which it approved nine days of coverage. As of November 2, 2018, however, UBH denied all further coverage for Mr. Doe's residential rehabilitation services.

1    102.    In its November 7, 2018 written notification of the adverse benefit determination,

2    UBH cited Optum's Level of Care Guideline for Substance Use Residential Rehabilitation Level

3    of Care. The letter stated:

4
> There is no clinical information to support the need for 24 hour
5
> residential rehabilitation care and support. You are medically
> stable. You are not having issues with significant withdrawals and
6
> you were not started on any medication assisted treatment that
> requires continued 24 hour Residential Rehabilitation monitoring or
7
> management. You are not reported to have any psychiatric issues
> that would prevent you from continuing treatment outside a 24 hour
8
> Residential Rehabilitation monitored setting. You are not in any
9
> danger of harming yourself or others, and are able to care for
> yourself. You have been involved in treatment and you have had
10
> substance recovery and coping skills education.

11    103.    The only reason UBH cited for denying coverage, in full, was that the request for

12    residential treatment did not satisfy UBH's Level of Care Guidelines.

13    104.    The letter concluded that Mr. Doe "could continue care" in a partial hospitalization

14    program "with community resources such as sober living and 12 step programming." Sober living

15    services, which do not include clinical treatment services, are excluded under Mr. Doe's plan. 12-

16    step programming is a type of peer support typically provided at no cost in a community setting,

17    and thus such programs are also not covered services under Mr. Doe's plan. In other words, UBH

18    recognized that Mr. Doe needed the 24-hour structure and support of a residential level of care,

19    but preferred for him to cobble that level of care together by supplementing covered services at an

20    inadequate level of care with non-covered services.

21    105.    In any case, as alleged above, residential treatment subsumes subsumes the clinical

22    services provided in PHP (as well as IOP and outpatient), such that services at a partial

23    hospitalization level of care are necessarily included within residential treatment services.

24    106.    Mr. Doe timely appealed the denial. UBH's February 13, 2009 appeal denial letter

25    also cited the Optum Level of Care Guideline for the Substance Use Disorder Residential

26    Rehabilitation Level of Care, and explained:

27

28

-24-

> [I]t is noted you had made progress and that your condition no longer met Guidelines for further coverage of treatment in this setting.
>
> You were not in any serious or severe form of withdrawal. There was no medical comorbidity that required nursing care. Your psychiatric condition was stable. There was no psychosis, no suicidal ideation, no self-harm, no threats to others, no aggressive or bizarre behavior, and your behavior was under good control. You appeared to be engaged and participating in groups and activities without the need for strict supervision and monitoring. There was no risk of imminent relapse. Sober living was available, and your family was supportive.

107. The only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

108. This time, UBH opined that Mr. Doe "could have continued care in the Substance Use Disorder Intensive Outpatient Program setting." Residential treatment subsumes subsumes the clinical services provided in IOP (as well as outpatient).. Thus, services at an intensive outpatient level of care are necessarily included within residential treatment services.

109. Mr. Doe submitted a second-level internal appeal, which UBH also denied. In a March 12, 2019 letter, UBH again upheld the denial of coverage, again citing "the Optum Level of Care Guideline for the SUBSTANCE USE DISORDER RESIDENTIAL REHABILITATION Level of Care." The letter explained,

> [I]t is noted you had made progress and that your condition no longer met Guidelines for further coverage of treatment in this setting.
>
> You were not in withdrawal. You had no medical comorbidity that required 24 hour nursing care. Your psychiatric condition was stable. You had no psychosis, no suicidal ideation, no self-harm, no threats to others, no aggressive or bizarre behavior. You claimed to be motivated for recovery and were engaged and participating in groups and activities without the need for strict supervision and monitoring. You had no risk of imminent relapse. Sober living was available, and your family was supportive.

110. Again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

111. UBH's March 12, 2019 letter again opined that Mr. Doe "could have continued care" in the "SUBSTANCE USE DISORDER INTENSIVE OUTPATIENT PROGRAM setting."

112. Even though his plan required only two levels of internal appeal, Mr. Doe tried yet again, submitting another appeal on May 28, 2019. UBH denied that appeal as well, again stating that the denial was "[b]ased on the Optum Level of Care Guideline for the Substance Use Disorder Residential Rehabilitation Level of Care." UBH's June 28, 2019 appeal denial letter further explained,

> After reviewing the medical records, it is noted you had made progress and that your condition no longer met the Guidelines for further coverage of treatment in this setting. You were doing better. You were stable from a medical and mental health standpoint. You did not have serious post-acute withdrawal symptoms. You were motivated for recovery and participating in treatment. You were attending 12-step meetings. You were able to take care of your needs. You were tolerating your medication. You had your wife's support. You did not require 24-hour care.

113. Yet again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

114. The letter continued, "You could have continued care in the Substance Use Disorder Intensive Outpatient Program setting along with community support groups and medication-assisted treatment."

115. UBH's June 28, 2019 letter stated, "[t]his is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted."

116. By filing all administrative appeals required under the Doe Plan, Plaintiff Doe exhausted his administrative remedies.

117. Based on the clinical advice of his treating providers, Mr. Doe remained in residential rehabilitation until November 21, 2018. Mr. Doe incurred significant unreimbursed out-of-pocket expenses for the services he received there.

118. Each of UBH's letters denying coverage to Mr. Doe also stated that he "could continue care" in a Partial Hospitalization Program or Intensive Outpatient Treatment setting. Despite its own finding that services at the partial hospitalization or intensive outpatient levels of

care were medically necessary, UBH did not approve benefits for the lesser-included services Mr. Doe received at Caron at the "daily rate" applicable to either of those lesser-included levels of care. Nor did UBH approve benefits for any of the component services Mr. Doe received while in residential treatment at Caron. Instead, UBH denied coverage in full, despite its own recognition that Mr. Doe needed ongoing treatment.

119.    In addition, despite its finding that PHP or IOP services were medically necessary for Mr. Doe, UBH's denial letters did not state that UBH would authorize coverage for any portion of the treatment services Mr. Doe was receiving at Caron, even the component services that were materially identical to those he would have received through PHP or IOP. UBH did not inform Mr. Doe that benefits were or would be approved for any lesser-included level of care. The letters also did not describe what additional material or information would be necessary for Mr. Doe to perfect a claim for the PHP or IOP services or any other component services he was receiving a Caron. Instead, as dictated by its Facility-Based Behavioral Health Program Reimbursement Policy, UBH denied coverage, in full, for each day of residential treatment and all the component parts of that treatment.

120.    The only reason UBH cited for denying coverage was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines. UBH did not cite any administrative or clinical ground for denying coverage for the component services that were materially identical to those Mr. Doe would have received through a partial hospitalization or intensive outpatient program. Nor did UBH disclose that its denial of coverage for all the services was based on its Facility-Based Behavioral Health Program Reimbursement Policy. At the same time, UBH admitted that partial hospitalization services or intensive outpatient services were medically necessary and appropriate for Mr. Doe. Accordingly, UBH should have approved coverage under Mr. Doe's Plan for the component services Mr. Doe received that were materially identical to those provided in a partial hospitalization or intensive outpatient program.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### c. **Plaintiff Loe**

121.    On November 29, 2018, Plaintiff Loe's son was admitted to Telos Residential Treatment Center ("Telos") for residential treatment of his attention deficit hyperactivity disorder, generalized anxiety disorder, and mood disorder. UBH authorized coverage for about five days, but then denied coverage from December 4, 2018 onward.

122.    In its April 23, 2019 written notification of the adverse benefit determination, UBH cited the "Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care" as the reason for its denial. The Letter stated:

> Patient does not have thoughts to hurt himself or others . . . Patient has not been aggressive. . . Patient has been cooperative with treatment. . . Patient has been stable on medication.

123.    The only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

124.    The letter concluded that "care could continue" in a partial hospitalization program. As alleged above, residential treatment subsumes the clinical services provided in PHP (as well as IOP and outpatient), such that services at a partial hospitalization level of care are necessarily included within residential treatment services.

125.    An urgent appeal was submitted on May 16, 2019, which UBH denied on June 14, 2019. The appeal denial letter stated that the denial was "[b]ased on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care and Common Criteria for Clinical Best Practices for all levels of care," and stated:

> As of 12/04/2018, [your son's] symptoms appeared to have stabilized to the extent that 24/7 monitoring in a supervised Residential setting was no longer required to avoid risk of hark to self or others. There was minimal evidence of further acute impairment of behavior or cognition that interfered with his activities of daily living to the extent his welfare or others was endangered. . . He was generally described as cooperative, responsive to staff, medication adherent, and doing better. . . There were no serious acute behavioral management challenges requiring 24 hour care and supervision. . . He had no suicidal or self harm thinking. . . He generally posed no risk of harm to others.

126.    Again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

127.    The letter also noted that Mr. Loe's son's "overall care could have continued at that point in a Partial Hospitalization setting, preferably near home, with individual therapy, family work and med management along with standard school adjustments."

128.    Mr. Loe also submitted a second-level appeal on June 25, 2019, which UBH denied. In its July 25, 2019 denial letter, UBH again upheld the denial of coverage, again citing "the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care." The letter stated:

> [Y]our child's condition no longer met Guidelines for further coverage of treatment in this residential setting. He has not been aggressive. He was not a danger to self or others. He had been cooperative with the treatment and stable on his medicines. He had no medical complaints.

129.    Yet again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

130.    The letter again concluded that Mr. Loe's son "could continue care in a Mental Health Partial Hospitalization Program."

131.    The July 25, 2019 letter further stated, "[t]his is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted."

132.    By filing all administrative appeals required under the Loe Plan, Plaintiff Loe exhausted his administrative remedies.

133.    Based on the clinical advice of his treating providers, Mr. Loe's son remained in residential treatment at Telos until April 22, 2019. Mr. Loe incurred significant unreimbursed out-of-pocket expenses for his son's residential treatment services from December 4, 2018 through April 22, 2019. And, despite having approved five days of treatment, UBH never reimbursed Mr. Loe for those days.

134.    Each of UBH's letters denying coverage to Mr. Loe's son also stated that care could continue in the Partial Hospitalization Program setting. Despite its own finding that

services at a partial hospitalization program level of care were medically necessary, UBH did not approve benefits for the services Mr. Loe's son received at Telos at the "daily rate" applicable to that lesser-included level of care. Nor did UBH approve coverage for any of the component services Mr. Loe's son received while in residential treatment at Telos. Instead, UBH denied coverage in full, despite its own finding that Mr. Loe's son needed ongoing treatment.

135.    In addition, despite finding that PHP services were medically necessary for Mr. Loe's son, UBH's denial letters did not state that UBH would authorize coverage for any portion of the treatment services Mr. Loe's son was receiving at Telos, even the component services that were materially identical to those he would have received in PHP. UBH did not inform Mr. Loe that benefits were or would be approved for any lesser-included level of care. The letters also did not describe what additional material or information would be necessary for Mr. Loe to perfect a claim for the PHP-equivalent services or any other component services his son was receiving at Telos. Instead, as dictated by its Facility-Based Behavioral Health Program Reimbursement Policy, UBH denied coverage, in full, for each day of residential treatment and all the component parts of that treatment.

136.    The only reason UBH cited for denying coverage was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines. UBH did not cite any administrative or clinical ground for denying coverage for the component services that were materially identical to those Mr. Loe's son would have received through a partial hospitalization program. Nor did UBH disclose that its denial of coverage for all the services was based on its Facility-Based Behavioral Health Program Reimbursement Policy. At the same time, UBH admitted that partial hospitalization services were medically necessary and appropriate for Mr. Loe's son. Accordingly, UBH should have approved coverage under Mr. Loe's Plan for the component services his son received that were materially identical to those provided in a partial hospitalization program.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### d.  **Plaintiff Poe**

137.    On May 14, 2019, Plaintiff Poe was admitted to the Lindner Center of Hope ("Lindner") in Mason, Ohio for residential treatment of his chronic depression and anxiety with substance use disorder that made it difficult for him to function. Based on the clinical advice of his treating providers, Mr. Poe remained in residential treatment at Lindner until June 11, 2019. UBH approved coverage for fourteen days, but then denied coverage for Mr. Poe's residential treatment, in full, from June 4, 2019 forward.

138.    In its June 7, 2019 written notification of its adverse benefit determination, UBH cited the "Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care," and explained:

> The criteria are not met because you do not need the care provided in a 24 hour Residential setting. You are doing better. In your case, you can control yourself better. You are less depressed. You are not feeling like harming yourself or others.

139.    The only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

140.    The letter concluded that Mr. Poe "could continue care in the mental health outpatient setting." Residential treatment subsumes outpatient behavioral health treatment. Thus, outpatient services are necessarily included within residential treatment services.

141.    Mr. Poe submitted an appeal on August 12, 2019, which UBH received on August 13, 2019. In that appeal, Mr. Poe stated he "would like to understand the clinical criteria and standards of care that United used in making the denial decision and how these are in line with national standards of care." Under applicable ERISA regulations, UBH was required to provide Mr. Poe with the clinical criteria UBH used to make its determination.

142.    UBH did not respond to Mr. Poe's appeal until February 4, 2020, almost six months later. UBH affirmed its denial, based on the "Optum Level of Care Guidelines for Mental Health Residential and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Guidelines." UBH explained:

> You were doing better. You had worked hard and had made good progress. Your mood had improved. Your withdrawal symptoms from stimulants were better. You were calm and cooperative. It seems that your care could have continued in a less intensive setting.

143.    Again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

144.    Mr. Poe submitted a second level appeal on March 24, 2020. In his appeal letter, Mr. Poe specifically requested that UBH provide coverage for medically necessary services that were "separate and apart from" residential treatment, including the costs of medications, labs, and individual and group therapy. That is, Mr. Poe asked UBH to consider his request for component services he received at Lindner on an un-bundled basis.

145.    On June 5, 2020, UBH denied Mr. Poe's second level appeal, again citing the "Optum Level of Care Guidelines." The letter represented that UBH's denial of benefits did not mean that Mr. Poe "did not require additional health care, or that [he] needed to be discharged." Yet again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

146.    UBH did not approve coverage for the component services Mr. Poe received that were materially identical to services he could have received on an outpatient basis, despite the facts that UBH had previously found such services to be medically necessary for Mr. Poe, that those services were explicitly covered under the Poe Plan, and that coverage was separately requested by Mr. Poe.

147.    By filing all administrative appeals required under the Poe Plan, Plaintiff Poe exhausted his administrative remedies.

148.    Mr. Poe incurred significant unreimbursed out-of-pocket expenses for his residential treatment services. And, even though UBH approved coverage for 14 days of treatment, it underpaid the benefits due to Mr. Poe because it failed to separately calculate reimbursement of laboratory and pharmaceutical costs, as the Poe Plan required.

149.    UBH's letters denying coverage to Mr. Poe also stated that he "could continue care" in the mental health outpatient setting. Mr. Poe, moreover, explicitly requested that UBH cover services he received at Lindner that would be covered at the less-intensive level of care.

150.    Residential treatment subsumes clinical services such as individual and group therapy, medications, and labs, all of which would be covered on an outpatient basis under the Poe Plan. Thus, those services are necessarily included within residential treatment services.

151.    Despite its own finding that outpatient services were medically necessary for Mr. Poe, UBH did not approve benefits for the component services Mr. Poe received at the rates applicable to services at that lesser-included level of care. Instead, UBH denied coverage in full, despite its own repeated conclusions that Mr. Poe needed ongoing treatment.

152.    In addition, despite its finding that outpatient services were medically necessary for Mr. Poe, UBH's denial letters did not state that UBH  would authorize coverage for any portion of the treatment services Mr. Poe was receiving at Lindner, even the component services that were materially identical to outpatient services. UBH did not inform Mr. Poe that benefits were or would be approved for any lesser-included level of care. The letters also did not describe what additional material or information would be necessary for Mr. Poe to perfect a claim for the outpatient-equivalent services or any other component services he was receiving at Lindner. Instead, as dictated by its Facility-Based Behavioral Health Program Reimbursement Policy, UBH denied coverage, in full, for each day of residential treatment and all the component parts of that treatment.

153.    The only reason UBH cited for denying coverage was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines. UBH did not cite any administrative or clinical ground for denying coverage for the component services that were materially identical to those Mr. Poe could have received on an outpatient basis. Nor did UBH disclose that its denial of coverage for all the services was based on its Facility-Based Behavioral Health Program Reimbursement Policy. At the same time, UBH admitted that ongoing services were medically necessary and appropriate for Mr. Poe. Accordingly, UBH should have approved

coverage under Mr. Poe's Plan for the component services he received that were materially identical to services that are also available on an outpatient basis.

### e. Plaintiff Roe

154.     On June 3, 2019, Plaintiff Roe was admitted to LifeSkills South Florida/Pharos Group, LLC ("LifeSkills") for residential treatment of his substance abuse, depression, and anxiety. Mr. Roe was admitted to LifeSkills several weeks after experiencing frequent suicidal thoughts.

155.     UBH denied all coverage. In its June 7, 2019 written notification of the adverse benefit determination, UBH cited the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care. The Letter stated:

> The criteria are not met because: . . . You are cooperative and doing better . . . You are thinking clearly. . . You have moderate symptoms of depressions. . . *You do not have concerning medical problems* (emphasis added).

156.     The only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

157.     The letter concluded that Mr. Roe "could continue care" in a partial hospitalization program, and noted that the denial did not mean that Mr. Roe needed to be discharged. As alleged above, residential treatment subsumes the clinical services provided in PHP (as well as IOP and outpatient), such that services at a partial hospitalization level of care are necessarily included within residential treatment services.

158.     An urgent appeal was submitted on November 4, 2019, which UBH denied on December 4, 2019. The appeal denial letter stated that the denial was based on the "Optum Level of Care Guideline for the Mental Health Residential Level of Care," and stated:

> The criteria were not met because: . . . In your case: You had moderate symptoms of depression . . . You had no evidence of withdrawal . . . You were medically stable.

159.     Again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

160.    The letter concluded that Mr. Roe "could continue care" in a partial hospitalization program.

161.    Mr. Roe also submitted a second-level internal appeal, which UBH denied. In a January 14, 2020 letter, UBH again upheld the denial of coverage, again citing "the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care" and now also citing the "Common Criteria and Clinical Best Practices for all levels of care." Yet again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

162.    UBH's January 14, 2020 letter also stated, "[t]his is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted."

163.    By filing all administrative appeals required under the Roe Plan, Plaintiff Roe exhausted his administrative remedies.

164.    Based on the clinical advice of his treating providers, Mr. Roe remained in residential treatment at the LifeSkills until August 31, 2019. Mr. Roe incurred significant unreimbursed out-of-pocket expenses for his residential treatment services.

165.    Each of UBH's letters denying coverage to Mr. Roe also stated that he "could continue care" in the Partial Hospitalization Program setting.

166.    Despite its own finding that services at a partial hospitalization program level of care were medically necessary for Mr. Roe, UBH did not approve benefits for the services Mr. Roe received at the "daily rate" applicable to that lesser included level of care. Nor did UBH approve benefits for any of the component services Mr. Roe received while in residential treatment at LifeSkills. Instead, UBH denied coverage in full, despite its own recognition that Mr. Roe needed ongoing treatment.

167.    In addition, despite its finding that PHP services were medically necessary for Mr. Roe, UBH's denial letters did not state that UBH would authorize coverage for any portion of the treatment services Mr. Roe received, even the services that were materially identical to those he would have received through a partial hospitalization program. UBH did not inform Mr. Roe that benefits were or would be approved for any lesser-included level of care. The letters also did not

describe what additional material or information would be necessary for Mr. Roe to perfect a claim for the PHP-equivalent services or any other component services he received at LifeSkills. Instead, as dictated by its Facility-Based Behavioral Health Program Reimbursement Policy, UBH denied coverage, in full, for each day of residential treatment and all the component parts of that treatment.

168.    The only reason UBH cited for denying coverage was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines. UBH did not cite any administrative or clinical ground for denying coverage for the component services that were materially identical to those Mr. Roe would have received through a partial hospitalization program. Nor did UBH disclose that its denial of coverage for all the services was based on its Facility-Based Behavioral Health Program Reimbursement Policy. At the same time, UBH admitted that partial hospitalization services were medically necessary and appropriate for Mr. Roe. Accordingly, UBH should have approved coverage under Mr. Roe's Plan for the component services he received that were materially identical to those provided in a partial hospitalization program.

### f.  Plaintiff Zoe

169.    On July 8, 2019 John Zoe was admitted to Capstone Treatment Center ("Capstone") for residential treatment of his posttraumatic stress disorder. Based on the clinical advice of his treating providers, Mr. Zoe remained in treatment at Capstone until October 11, 2019.

170.    UBH denied all coverage. In its February 24, 2020 written notification of the adverse benefit determination, UBH cited its Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care. UBH opined, "[y]our care could have continued in the Partial Hospitalization setting with therapy and medication management."

171.    The only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines. As alleged above, residential treatment subsumes subsumes the clinical services provided in PHP (as well as IOP

and outpatient) , such that services at a partial hospitalization level of care are necessarily included within residential treatment services.

172.    An appeal was submitted on May 11, 2020, which UBH denied on May 19, 2020. UBH's appeal denial letter reiterated that the denial was based on the "Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care," and stated:

> You were admitted for treatment of your mood issues. Your care could have continued in the Partial Hospitalization Program setting with therapy and medication management. You had no symptoms which required 24 hour supervision.

173.    Again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

174.    The letter concluded that Mr. Zoe's condition "did not meet the Guidelines for Coverage. . . [and his] care and recovery could have continued in the Mental Health Partial Hospitalization Program."

175.    Mr. Zoe also submitted a second-level appeal on May 28, 2020, which UBH also denied. In a June 5, 2020 letter, UBH again upheld the denial of coverage, again citing "the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care" and now citing the "Optum Common Criteria and Clinical Best Practices for All Levels of Care Guidelines." The letter stated that Mr. Zoe's claim was denied because:

> You were wanting to work on your childhood trauma. You had good family support. Your mood was generally stable. You did not want to harm yourself. You did not want to harm others. You were not having any significant withdrawal symptoms from your cannabis use. You were calm and cooperative. *It seems that your care could have continued in a less intensive setting.* (emphasis added).

176.    Yet again, the only reason UBH cited for denying coverage, in full, was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines.

177.    The June 5, 2020 letter also stated, "[t]his is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted."

178.    By filing all administrative appeals required under the Zoe Plan, John Zoe exhausted his administrative remedies.

179.    As a result of UBH's repeated medical-necessity denials, Mr. Zoe incurred significant unreimbursed out-of-pocket expenses for the services he received at Capstone.

180.    UBH's letters denying coverage to Mr. Zoe, however, uniformly stated that Mr. Zoe could have continued care in a Partial Hospitalization Program or a less intensive setting.

181.    Despite its own finding that services at a partial hospitalization program level of care were medically necessary, UBH did not approve benefits for the services Mr. Zoe received at the "daily rate" applicable to that lesser-included level of care. Nor did UBH approve benefits for any of the component services Mr. Zoe received while in residential treatment at Capstone. Instead, UBH denied coverage for the services in full, despite its own finding that Mr. Zoe needed ongoing treatment.

182.    In addition, despite finding that PHP services were medically necessary for Mr. Zoe, UBH's denial letters did not state that UBH would authorize coverage for any portion of the treatment services Mr. Zoe received, even the component services that were materially identical to those he would have received in PHP. UBH did not inform Mr. Zoe that benefits were or would be approved for any lesser-included level of care. The letters also did not describe what additional material or information would be necessary for Mr. Zoe to perfect a claim for the PHP-equivalent services he received at Captstone. Instead, as dictated by its Facility-Based Behavioral Health Program Reimbursement Policy, UBH denied coverage, in full, for each day of residential treatment and all the component parts of that treatment.

183.    The only reason UBH cited for denying coverage was that the request for residential treatment did not satisfy UBH's Level of Care Guidelines. UBH did not cite any administrative or clinical ground for denying coverage for the component services that were materially identical to those Mr. Zoe would have received through a partial hospitalization program. Nor did UBH disclose that its denial of coverage for all the services was based on its Facility-Based Behavioral Health Program Reimbursement Policy. At the same time, UBH admitted that partial hospitalization services were medically necessary and appropriate for Mr.

Zoe. Accordingly, UBH should have approved coverage under Mr. Zoe's Plan for the component services he received that were materially identical to those provided in a partial hospitalization program.

### STANDING

184.    Plaintiffs have been harmed, and are likely to be harmed in the future, by UBH's misconduct alleged herein, which gives them standing to pursue their claims. UBH's development of its Guidelines and Facility-Based Behavioral Health Program Reimbursement Policy in its own interests, rather than in the interests of the participants and beneficiaries of the Plans, and its adoption of those Guidelines and Policy as its standard coverage criteria, among other harms, deprived Plaintiffs of their right to a full and fair review of their requests for benefits; presented a material risk to Plaintiffs' interest in the benefits promised by their employer-sponsored Plans, including a material risk to Plaintiffs' ERISA-defined right to have their plan-conferred benefits interpreted and administered in their best interests and in accordance with their Plan terms; a material risk that their claims will be administered under a set of Guidelines and Reimbursement Policies that impermissibly narrow the scope of their benefits; and the present harm that UBH's self-serving internal policies have made and continue to make it impossible for Plaintiffs to know the scope of coverage their Plans will actually provide. Furthermore, each of the Plaintiffs incurred substantial, unreimbursed out-of-pocket expense as a result of UBH's unlawful denials. In addition, Plaintiff Beach was forced to remove her daughter from residential treatment prematurely because of UBH's wrongful denial of coverage.

### CLASS ACTION ALLEGATIONS

185.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

186.    UBH serves as the claims administrator fiduciary for mental health and substance use use disorder treatment claims for other ERISA-governed health insurance plans that define covered behavioral health services in the same way as the Plaintiffs' Plans, including enumerating the covered component services and imposing the essential "GASC Requirement" prerequisite that treatment must be consistent with generally accepted standards of care.

187.     The policies and practices described above that UBH followed with respect to the requests for coverage filed by or on behalf of Plaintiffs are the same as those that UBH has applied to other similarly situated plan participants and beneficiaries seeking coverage under their employer-sponsored health plans for mental health and substance use disorder treatment, and UBH's development and use of its self-serving Guidelines and Facility-Based Behavioral Health Program Reimbursement Policy harmed those similarly-situated plan members in the same ways as the Plaintiffs.

188.     As such, pursuant Federal Rule of Civil Procedure 23, Plaintiffs bring their claims, set forth in the counts below, on behalf of the following putative classes of similarly situated individuals.

**a.  Guideline Denial Class and Reprocessing Subclass**

189.     Plaintiffs intend to seek certification of a "Guideline Denial Class," defined as follows:

> Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a mental illness or substance use disorder, or any portion thereof, was denied by UBH, between February 8, 2018 and the present, based upon UBH's Level of Care Guidelines, and was not subsequently approved in full following an administrative appeal.

> The Guideline Denial Class excludes any member of a fully-insured plan governed by both ERISA and the state law of Connecticut, Rhode Island, or Texas, whose request for coverage of residential treatment was related to a substance use disorder, except that the Class includes members of plans governed by the state law of Texas who were denied coverage of substance use disorder services sought or provided outside of Texas.

190.     Plaintiffs Beach, Doe, Loe, Poe, Roe, and Zoe will be the Class Representatives for the Guideline Denial Class.

191.     Plaintiffs also intend to seek certification of a "Guideline Denial Reprocessing Subclass" within the Guideline Denial Class, defined as follows:

> Any member of the Guideline Denial Class who incurred expenses for residential treatment for which benefits were not paid, except

1

2

3

4

5

that the Reprocessing Subclass shall not include class members whose written notification of denial, as reflected in UBH's records, (a) identifies a reason for denying the request for coverage other than the class member's failure to satisfy UBH's Level of Care Guidelines, and/or (b) specifies that the member's failure to satisfy the applicable Guideline was based solely on a portion of the Guideline that was unchallenged in this action.

6        192.    Plaintiffs Beach, Doe, Loe, Poe, Roe, and Zoe will be the Class Representatives

7    for the Guideline Denial Reprocessing Subclass.

8            **b.  Bundled Denial Class and Reprocessing Subclass**

9        193.    Plaintiffs, further, intend to seek certification of a "Bundled Denial Class," defined

10   as follows:

11

12

13

14

15

16

17

18

19

Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied in full by UBH, between February 8, 2018 and the present and was not subsequently approved in full following an administrative appeal, and (a) whose written notification of denial states that services would be appropriate or could be provided at the partial hospitalization, intensive outpatient, or outpatient level of care; and (b) whose request for coverage of residential treatment UBH denied on a bundled, "per diem" basis rather than either approving services at the applicable rate for the alternative level of care UBH identified in its denial letter or approving coverage for any component services enumerated in the plan and provided as part of the residential treatment program for which coverage was requested.

20       194.    Plaintiffs Beach, Doe, Loe, Poe, Roe, and Zoe, will be the Class Representatives

21   for the Bundled Denial Class.

22       195.    Plaintiffs also intend to seek certification of a "Bundled Denial Reprocessing

23   Subclass" within the Bundled Denial Class, defined as follows:

24

25

26

27

Any member of the Bundled Denial Class who incurred unreimbursed expenses for covered behavioral healthcare services, provided at a residential treatment facility, that were equivalent to services UBH stated were appropriate or could be provided to the member, but for which UBH denied coverage on a bundled, "per diem" basis as stated in the Bundled Denial Class definition above.

28

196.    Plaintiffs Beach, Doe, Loe, Poe, Roe, and Zoe will be the Class Representatives for the Bundled Denial Reprocessing Subclass.

197.    The members of the Guideline Denial Class and the Bundled Denial Class, and each of their respective Subclasses, can be objectively ascertained through the use of information contained in UBH's files because UBH knows who its insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

198.    There are so many persons within each of the putative Classes and Subclasses that joinder is impracticable.

199.    Certification of the Classes and Subclasses is desirable and proper because there are questions of law and fact in this case that are common to all members of each respective Class and Subclass. Such common questions of law and fact include, but are not limited to, the following:

- What legal duties does ERISA impose upon UBH when it is serves as a claims administrator for mental health and substance use disorder claims?

- What is the collateral estoppel effect of Judge Spero's post-trial Findings of Fact and Conclusions of Law in the *Wit* Litigation with respect to questions at issue in this case?

- Did UBH engage in a fiduciary act when it developed its mental health and substance use level of care guidelines?

- Did UBH engage in a fiduciary act when it developed its Facility-Based Behavioral Health Program Reimbursement Policy?

- Did UBH engage in a fiduciary act when it adjudicated and denied the class members' requests for benefits?

- Did UBH allow its own financial self-interest to infect its development of its Level of Care Guidelines?

- Did UBH allow its own financial self-interest to infect its development of its Facility-Based Behavioral Health Program Reimbursement Policy?

- Were UBH's 2018 and 2019 Level of Care Guidelines consistent with and a reasonable interpretation of the relevant generally accepted standards of care?

- Did UBH breach its fiduciary duties by denying coverage to the class members using its Level of Care Guidelines?

- Did UBH's standard policy and practice of issuing denials of claims for all services received during residential treatment on a bundled, "per-diem" basis rather than considering the services on an un-bundled basis violate the terms of the class members' Plans and/or breach UBH's fiduciary duties?

- What remedies are available if UBH is found liable for the claims alleged?

200.    Certification is desirable and proper because the Plaintiffs' claims are typical of the claims of the members of each Class and Subclass Plaintiffs seek to represent.

201.    Certification is also desirable and proper because Plaintiffs will fairly and adequately protect the interests of each Class and Subclass they seek to represent. There are no conflicts between Plaintiffs' interests and those of other members of the Classes and Subclasses, and Plaintiffs are cognizant of their duties and responsibilities to all members of each Class and Subclass. Plaintiffs' attorneys are qualified, experienced, and able to conduct the proposed class action litigation.

202.    It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

203.    The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the class through numerous separate actions.

204.    The Plaintiffs and members of the putative Classes and Subclasses have standing to pursue these claims because their injuries are traceable to UBH's conduct of improperly developing its Guidelines and Facility-Based Behavioral Health Program Reimbursement Policy in its own self-interest and using those improper Guidelines and Policy in denying requests for coverage.

1

## COUNT I

2

## Breach of Fiduciary Duty

3        205.    Plaintiffs incorporate by reference the factual allegations above as though such

4   allegations were fully stated herein.

5        206.    Plaintiffs bring this Count on behalf of themselves and the members of the putative

6   Guideline Denial Class and the putative Bundled Denial Class.

7        207.    As alleged above, UBH has and exercises delegated discretionary authority with

8   respect to the administration of mental health and substance use disorder benefits under the

9   Plaintiffs' and class members' employer-sponsored health Plans. As such, UBH is an ERISA

10  fiduciary.

11       208.    As an ERISA fiduciary, pursuant to 29 U.S.C. § 1104(a), UBH owes fiduciary

12  duties to the plan members, including the duty to carry out its duties solely in the interest of the

13  participants and beneficiaries of the Plans and for the exclusive purpose of providing benefits to

14  the participants and beneficiaries (i.e., the duty of loyalty), as well as the duty to exercise

15  reasonable prudence and due care (i.e., the duty of care).

16       209.    UBH breached its fiduciary duties and, therefore, violated ERISA by allowing its

17  own financial self-interest to infect its development of its Level of Care Guidelines and by

18  deliberately developing and adopting as its standard medical-necessity criteria to implement the

19  plans' GASC Requirement Guidelines that were much more restrictive than generally accepted

20  standards of care, in order to increase its own profits and reduce expenses for its plan-sponsor

21  customers by reducing the amount of benefits due to plan participants and beneficiaries.

22       210.    UBH also breached its fiduciary duties and violated ERISA by adopting and

23  enforcing its Facility-Based Behavioral Health Program Reimbursement Policy, which serves

24  UBH's interests in reducing so-called "benefit expense," instead of serving the interests of Plan

25  participants and beneficiaries in the fair adjudication of their requests for coverage. Instead of

26  administering benefits solely in the interests of the plan members and "for the exclusive purpose

27  of. . . providing benefits to participants and their beneficiaries," UBH developed and applied a

28

standard policy designed to minimize the amount of benefits paid to plan members and to maximize the impact of any denial of coverage.

211.    ERISA provides a right of action for plan participants and beneficiaries to sue to enjoin any act or practice which violates any provision of ERISA, 29 U.S.C. § 1132(a)(3)(A), which includes ERISA's fiduciary duty provision, 29 U.S.C. § 1104(a), and ERISA's mandate that plan administrators must provide for a full and fair review of any benefit denial, 29 U.S.C. § 1133. ERISA also provides a right of action for participants and beneficiaries to obtain other appropriate equitable relief to redress violations of ERISA or to enforce ERISA. 29 U.S.C. § 1132(a)(3)(B).

212.    As set forth in the Prayer for Relief below, Plaintiffs seek declaratory and injunctive relief, as well as other appropriate equitable relief, to remedy UBH's fiduciary breaches as alleged herein.

## COUNT II

### Arbitrary and Capricious Denial of Benefits
### Pursuant to Excessively Restrictive Guidelines

213.    Plaintiffs incorporate by reference the factual allegations above as though such allegations were fully stated herein.

214.    Plaintiffs bring this Count on behalf of themselves and the members of the putative Guideline Denial Class.

215.    As alleged above, UBH used its Level of Care Guidelines to implement the GASC Requirement in Plaintiffs' and the Guideline Denial Class members' plans, even though the Guidelines conflicted with, and were an unreasonable interpretation of, the written provision in the plans that required services to be consistent with generally accepted standards of care. The Level of Care Guidelines were the exclusive and decisive basis for each benefit denial at issue in this claim, and Plaintiffs and members of the putative Guideline Denial Class might have been entitled to benefits if UBH had applied guidelines that were consistent with the relevant plan terms. As such, UBH's use of an incorrect standard to implement the GASC Requirement prejudiced Plaintiffs and the Guideline Denial Class members.

-45-

216.    UBH also failed to establish any administrative review procedures that would enable plan participants and beneficiaries to challenge the content of UBH's Level of Care Guidelines (as opposed to appealing how UBH applied the Guidelines to the facts of a particular claim). Accordingly, Plaintiffs' and the Class members' claims are deemed exhausted under ERISA's implementing regulations. *See* 29 C.F.R. § 2560.503-1(g) & (l).

217.    ERISA provides a right of action for plan participants and beneficiaries to (among other things) enforce their rights under the terms of their plans and clarify their right to future benefits under the terms of their plans. 29 U.S.C. § 1132(a)(1)(B). ERISA also provides a right of action for participants and beneficiaries to sue to enjoin any act or practice which violates the terms of their plans. 29 U.S.C. § 1132(a)(3)(A). ERISA also provides a right of action for participants and beneficiaries to obtain other appropriate equitable relief to redress violations of their plan terms or to enforce terms of their plans. 29 U.S.C. § 1132(a)(3)(B).

218.    Accordingly, Plaintiffs bring this Count under ERISA, 29 U.S.C. § 1132(a)(1)(B), and, to the extent that the relief available under § 1132(a)(1)(B) is not adequate to fully remedy UBH's misconduct alleged in this Count, Plaintiffs also bring this Count pursuant to ERISA, 29 U.S.C. §§ 1132(a)(3)(A) and (a)(3)(B).

219.    As set forth in the Prayer for Relief below, Plaintiffs seek declaratory and injunctive relief, as well as other appropriate equitable relief, to remedy UBH's abuses of its discretion alleged herein. In addition, on behalf of themselves and the members of the Guideline Denial Reprocessing Subclass, Plaintiffs seek an injunction requiring UBH to reprocess their requests for coverage using appropriate standards.

## COUNT III

### Arbitrary and Capricious Denial of Benefits for
### All Services Received in Residential Treatment on a Bundled Basis

220.    Plaintiffs incorporate by reference the factual allegations above as though such allegations were fully stated herein.

221.    Plaintiffs bring this Count on behalf of themselves and the members of the putative Bundled Denial Class.

222.    As alleged above, UBH denied coverage to the Plaintiffs and the members of the putative Bundled Denial Class based solely on UBH's conclusion, under its own self-serving Guidelines, that services at the residential treatment level of care were not necessary or appropriate for the patient, pursuant to UBH's implementation of the Plans' GASC Requirements. However, in so doing, UBH expressly opined in its written notifications of denial that a different, less-intensive level of care was necessary and/or appropriate for each member.

223.    Despite making a determination, as to each Plaintiff and Bundled Denial Class member, that services at a less-intensive level of care (i.e., partial hospitalization, intensive outpatient, or outpatient) were medically necessary, and despite its failure to cite any administrative or clinical reason for denying coverage for services at the identified less-intensive level of care, UBH did not approve coverage for any portion of the requested residential treatment services, including component services expressly covered under the Plaintiffs' and the Bundled Denial Class members' plans, even when coverage for those component services was requested separately. Instead, UBH denied coverage for all services the members received while in residential treatment, bundled together.

224.    UBH's standard policy and practice of denying coverage for all facility-based services whenever it rejects coverage for treatment at a particular level of care, rather than considering the services on an un-bundled basis or approving coverage for the value of a lesser-included level of care, violates and/or unreasonably interprets the Plaintiffs' and the Bundled Denial Class members' plans. The plans cover facility-based behavioral health services at a full range of service intensities (including but not limited to residential treatment, partial hospitalization programs, and intensive outpatient programs) and also expressly cover certain component services that are "integral" to and typically provided as part of residential treatment programs, including but not limited to evaluations, assessment and treatment planning; individual, group, and family therapy; medication management; lab testing; and pharmaceutical products (i.e., the "Enumerated Services"). The plans, moreover, do not exclude coverage for PHP, IOP or the Enumerated Services based solely on the fact that they were provided in a residential treatment setting. Nor do the plans exclude coverage for PHP, IOP, or the Enumerated Services,

when they are medically necessary, based solely on the fact that the member also received *additional* behavioral health services that UBH does not believe are medically necessary.

225.    As alleged in further detail below, by denying Plaintiffs' and the Bundled Denial Class members' requests for coverage, in full, on a bundled basis, as alleged herein, UBH also failed to establish and follow reasonable claims procedures as required by ERISA and its implementing regulations. *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1. Accordingly, Plaintiffs and the Bundled Denial Class members are "deemed to have exhausted the administrative remedies available under" their Plans. *See* 29 C.F.R. § 2560.503-1(g) & (l).

226.    Plaintiffs bring this Count under ERISA, 29 U.S.C. § 1132(a)(1)(B), and, to the extent that the relief available under § 1132(a)(1)(B) is not adequate to fully remedy UBH's misconduct alleged in this Complaint, Plaintiffs also bring this Count pursuant to ERISA, 29 U.S.C. §§ 1132(a)(3)(A) and (a)(3)(B).

227.    As set forth in the Prayer for Relief below, Plaintiffs seek declaratory and injunctive relief, as well as other appropriate equitable relief, to remedy UBH's abuses of its discretion alleged herein. In addition, on behalf of themselves and the members of the Bundled Denial Reprocessing Subclass, Plaintiffs seek an injunction requiring UBH to reprocess their requests for coverage using appropriate standards..

## COUNT III

### Failure to Establish and Follow Reasonable Claims Procedures

228.    Plaintiffs incorporate by reference the factual allegations above as though such allegations were fully stated herein.

229.    Plaintiffs bring this Count on behalf of themselves and the members of the putative Bundled Denial Class.

230.    As alleged above, ERISA requires plan fiduciaries to "provide adequate notice in writing" of "the specific reasons" for any benefit denial, "written in a manner calculated to be understood" by the plan participants or beneficiary, and to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review" of the denial. 29

1    U.S.C. § 1133. ERISA's implementing regulations set forth in further detail the requirements for

2    a reasonable claim processing procedure to comply with ERISA § 1133. *See generally* 29 C.F.R.

3    § 2560.503-1.

4        231.    UBH failed to establish and follow reasonable claims procedures as required by

5    ERISA and its implementing regulations. Among other things, UBH failed to disclose in its

6    denial letters, in a manner calculated to be understood by the Plaintiffs and the Bundled Denial

7    Class members, that their coverage requests were denied in full pursuant to UBH's internal

8    Facility-Based Behavioral Health Program Reimbursement Policy. UBH also failed to provide

9    any information on how the Plaintiffs or Class members could perfect their claims for the lesser-

10   included component services UBH admitted should be covered, such as by re-submitting the

11   claims on an un-bundled basis (which UBH would have rejected pursuant to its internal policy in

12   any case), or by submitting a claim for the lesser-included level of care UBH admitted was

13   medically-necessary. By so doing, UBH deprived the Plaintiffs and the Bundled Denial Class

14   members of any opportunity to object to the "specific reason" for the denial, in full, of their

15   requests for coverage and any opportunity to perfect their claims for benefits for the lesser-

16   included services, which should otherwise have been covered under their plans.

17       232.    Plaintiffs bring this Count under ERISA, 29 U.S.C. §§ 1132(a)(3)(A) and

18   (a)(3)(B), because UBH's unreasonable and unfair Facility-Based Behavioral Health Program

19   Reimbursement Policy violated ERISA and its implementing regulations.

20       233.    As set forth in the Prayer for Relief below, Plaintiffs seek declaratory and

21   injunctive relief, as well as other appropriate equitable relief, to remedy UBH's ERISA violations

22   alleged herein.

23

24                                **PRAYER FOR RELIEF**

25       WHEREFORE, Plaintiffs demand judgment in their favor and in favor of all others

26   similarly situated against Defendant as follows:

27       A.    Certifying the Classes and Subclasses and their claims, as set forth in this

28   Complaint, for class treatment;

B.      Appointing Plaintiffs as Class Representatives for the Classes and Subclasses, as set forth above;

C.      Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc. as Class Counsel;

D.      Declaring that the criteria in the 2018 and 2019 Level of Care Guidelines are not consistent with generally accepted standards of care;

E.      Permanently enjoining UBH from using guidelines or other clinical criteria that are more restrictive than generally accepted standards of care to implement any ERISA plan's requirement that services must be consistent with generally accepted standards of care;

F.      Declaring that UBH's policy and practice of denying benefits for otherwise-covered services for the sole reason that UBH required those services to be submitted on a "bundled" basis with additional services for which UBH denied coverage violates ERISA and the terms of Plaintiffs' plans;

G.      Permanently enjoining UBH from denying benefits for otherwise-covered services for the sole reason that those services were provided as a part of facility-based care or otherwise provided along with additional services for which UBH denied coverage;

H.      Ordering UBH to reprocess the Plaintiffs' and the Guideline Denial Reprocessing Subclass members' requests for coverage that it wrongfully denied based solely on challenged provisions of its 2018 or 2019 Level of Care Guidelines, pursuant to non-profit medical specialty association guidelines that are consistent with generally accepted standards of medical practice;

I.      Ordering UBH to reprocess, on an un-bundled basis, the Plaintiffs' and the Bundled Denial Reprocessing Subclass members' requests for coverage that it wrongfully denied pursuant to the policies and practices alleged above;

J.      Awarding other appropriate equitable relief, including but not necessarily limited to an appropriate monetary award based on disgorgement, restitution, surcharge or other basis, and additional declaratory and injunctive relief;

K.      Awarding Plaintiffs disbursements and expenses of this action, including reasonable attorneys' and expert fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and/or

1   L.  Granting such other and further relief as is just and proper in light of the evidence.

2 Dated: December 5, 2023     PSYCH-APPEAL, INC.

3

4               /s/ Meiram Bendat
                Meiram Bendat (Cal. Bar No. 198884)

5

6               ZUCKERMAN SPAEDER LLP
                D. Brian Hufford (*pro hac vice*)

7               Jason S. Cowart (*pro hac vice*)
                Caroline E. Reynolds (*pro hac vice*)

8               Samantha M. Gerencir (*pro hac vice*)

9               *Counsel for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:21-cv-08612-RS